Good morning, Your Honors. May it please the Court, my name is Ronald Ritchie. With the Court's permission, I would like to reserve approximately five minutes for a rebuttal. You're the same lawyer who was not on the telephone or was supposed to be on the telephone or whatever. That's me, Your Honor. That's me. All right. Go ahead. I'm glad I'm here today. My primary focus initially will be directed to the due process argument. And I would note that this case, the present case, falls within the four corners, I believe, of the Honorable Judge Gold's decision in Hernandez-Gill v. Gonzalez. And I'll kind of come back to that. But, you know, in this case, the immigration judge created a hostile, fearful, and bullying atmosphere, creating a chilling effect and thereby violating the petitioner's due process rights. In fact, he put her in the same situation. She had been in Cameroon where she had been persecuted by Mr. Thomas. He put her into—he emotionally abused her. He was manipulative. He was demanding, threatening, controlling. It seems to me that I understand why you may want to focus on— are you talking about the right to counsel question or what are you talking about? Yes, Your Honor. Well, I mean, the problem is that even though this judge kept saying he wasn't going to give the continuances and kept saying he wasn't going to deal with you by telephone, he, in fact, did give her the continuances and he did call your office and you weren't there. Given that, I don't know whether this is your best argument. Well, Your Honor, this Court has been clear that an individual asylum applicant has the right to—has a statutory right to counsel. Well, that's right. And she had a counsel and her counsel wasn't there, even on the telephone, even on the telephone, which is an odd place to be when you're trying to represent somebody at a merits hearing. But even on the telephone, you weren't there. Yes. And in this case, Your Honor, counsel had been retained approximately a week before that hearing and had filed a motion for continuance, which the judge denied, and then requested a telephonic hearing just due to the very limited time. But throughout the whole— And even though the IJ didn't know that this request had been made, which is a mistake and he should have known, even though he said he wasn't going to make the phone call, he did make the phone call. He did, Your Honor. And he was told by the receptionist that the lawyer would be in just a second or, you know, within a matter of a minute. Did you call back at that point? Yes, Your Honor. We called the court, but we were not able to—the judge was on the bench. We were not able to get through to him. Okay. I wouldn't mind hearing about the merits of the case, frankly. I'm sorry? I wouldn't mind hearing about the merits of the case, frankly. Yes, Your Honor. Well, Your Honor, the substantial evidence does not support the Board's decision. And part of the—you know, one of the big factors is that because she was not allowed to have the benefit of counsel, she was not able to present a lot of evidence, Your Honor. But the Board ruled that, well, because she had, in their opinion, had been firmly resettled in South Africa, the immigration judge nor the Board could consider any evidence or facts relating to how her life had been prior to leaving Cameroon. Is there any authority for that proposition? I.e., is there any case holding that if somebody then comes back to the original country, you just ignore everything that happened to them before they were in that country? No, Your Honor. There really isn't. It's not in the statute or the case law. You know, and so we understand the position of if one's firmly resettled, but we believe that there's two arguments to demonstrate that that's not really the situation here. One, because of the harm that she, the petitioner, and her brother had suffered in South Africa. And additionally, Your Honor, I don't think it's fair to a petitioner, to an asylum applicant, to say, well, we can't look back at the history to see how you have a subjective fear of harm, of persecution, or even if there's an objective. And I think that that is not, you know, logical or reasonable, that it's important to look at the totality of the circumstances. Tell me if I'm wrong. It seems to me that the root problem here is that there was no inquiry or adjudication as to whether or not she was firmly resettled in South Africa, and everything flowed from the lack of that determination. Am I missing something? Well, it seems like the judge made a conclusionary decision in that regard, Your Honor, and really didn't, other than I think the petitioner did testify a little bit or was asked questions and kind of explained why she left South Africa. But it wasn't really looked into, Your Honor. I agree with that. And the board just kind of opened. Well, if she was firmly resettled in South Africa, which possibly could have been the case, if there was a full hearing that explored that issue, then we have a different cup of tea here. Then, you know, she has to go back to South Africa, I guess, right? Yes, Your Honor. But nobody was at the government's position wasn't that she go back to South Africa.  Right. In the footnote, the board mentions that, that the government was not pressing for her to be returned there. And so that's why the board just seemed to overlook that or really just mentioned it in the footnote, really didn't deal with that issue. Well, if she was not firmly resettled in South Africa, then I imagine that all of her history would have to be considered. But if she was firmly established in South Africa, then that's the end of the case. Am I missing something? Your Honor, I don't agree with the first part. But if I'll do respect, I would not necessarily agree with the latter part because one still has to look to see if facts or if circumstances have happened after a person is, quote, unquote, firmly resettled, to cause that person to fear and to no longer feel safe. I mean, isn't the question here whether she could be sent back to Cameroon because that's what they were asking for? Yes. Whether that depends on her having been firmly resettled in South Africa for seven years, but now she apparently isn't, or at least the government doesn't see it that way. So they just want to take out the seven years, but they don't want to claim that she still belongs in South Africa. I would agree. And, Your Honor, I would also take the position that even if we were to assume arguendo that she was firmly resettled in South Africa, she still had a well-founded fear of persecution. Does the firmly resettled concept apply to withholding and as well as to asylum? Well, it does to withholding under the Act, Your Honor, but it would not under the torture convention. Because regarding that last point I was noting is upon her return to Cameroon, she was still victimized. She was still persecuted by Mr. Thomas. She hid in a church for the limited time that she was in Cameroon, and the same person that had raped her, beaten her, whipped her, sent her to the hospital, had the police lock her up. And even one time he beat her so bad when she was pregnant that she became unconscious. When she came to, he had stripped her naked and was sexually abusing her. This same individual attempted to do the same thing in public upon her return to Cameroon. He discovered she was at the church. He went there and found her as she had walked outside the church on the public, and he attempted to rape her in public. Based on the trauma, and I would argue that she clearly was a victim of post-traumatic stress disorder, seeing this man again and having him attempt to do the same thing to her that he had been doing for many, many years previously would definitely cause her to have subjective belief that her life is in danger. And I think it's objectively. He also attempted to have her children kidnapped just to abuse her, to harm her, to harass her, to intimidate her. So things continued to happen after she returned. It was almost like déjà vu. It was back to the same situation before. And the BIA, I'd say the BIA essentially treated this as a chance encounter with this guy. Exactly, Your Honor. I think they use a term like that. He came upon her, but he didn't come upon her. I gather even by her inartful description, he came looking for her. Yes, Your Honor. He sought her out. He had put pressure on her family, relatives, and friends in the village where she was from about her and where is she. And someone divulged to him, maybe multiple people, that she was hiding in a church, seeking refuge there. And when she steps out, he's waiting for her. He's her victim again. And yeah, clearly I think the board and the IJ just really didn't give that much value or thought. And it's tragic. And I think it violates due process. And it caused her not to be allowed to have a full and fair hearing, which she's entitled to. Also, the same man, Mr. Thomas, he threatened her family and friends. And he put her again in an isolated, vulnerable circumstance. And she was only able to escape from being raped again in public when she screamed and was able to get help and be able to get away from him that time. And not long after that, she fled Cameroon, fearing for her life again. And she also has the problem, if you will, a challenge of the police. This same man, Mr. Thomas, is a very powerful and influential businessman. He's well-connected, as the evidence showed. He's connected so much to the- What about, I mean, the real elephant in the room here is the particular social group problem, given now-I understand we have a new-because there's a new ruling on that. And on remand, you may, in fact, have a big problem. But what about with regard to what exists so far? There was also a finding that she wasn't part of the particular social group because she was no longer a domestic-had no domestic relationship with this man. Yes, Your Honor. And I believe that that was faulty reasoning on behalf of the board and the IJ, because it's just because, okay, she had two children with this man. They're always going to be in a relationship. If nothing else, parents. They may not be husband and wife. And in his mind, she was his property. That would never change, okay, no matter what. In his mind, she was his property. He could do with her as he willed, okay. So there was still a relationship. It may not be a husband-wife, and they were never legally married, but he treated her as his partner. He treated her as his sex slate, okay. He treated her as his victim. That never changed in his eyes, nor in her eyes. In her eyes, she saw him the same, you know, as aggressor, as abuser, from early on, you know, even today. To go back briefly to the counsel question, did you at the point of the appeal to the BIA submit a declaration about what actually happened and ask for a remand to find the facts? In other words, did you ever tell the BIA that you did try and get back in touch and so on? I mean, is there a declaration from you in the record somewhere? I don't believe there was a declaration, Your Honor, but I think the facts and disputed facts were that I had filed a motion for continuance upon being retained. That was denied. But I get stuck on the fact that you weren't there when the phone call was made, and there was no explanation of that in the record. True. That probably would have been helpful, Your Honor, if you would have done that. I mean, one would think that if you think there's going to be a hearing at a certain time and you get to do a telephonic hearing, that you would be there. Yes, Your Honor, and one thing we have is the time difference. Well, so what? You know what the time difference is. If somebody says they're going to have a hearing in California at 2 o'clock, that's 5 o'clock Maryland time, and you should be there. Right, Your Honor. Explanation about why you weren't there is a little hard to fault the ALJ. Well, the judge didn't call right at the 1 o'clock time that it was scheduled, nor it was sometime after that, after he had had a long discussion or, you know, a discussion with the petitioner about that she was wrong and she was causing people to commit suicide. Also, didn't your declaration say, your original motion, didn't say something like, either let me appear by telephone or I want to withdraw, which doesn't sound like you have much of a commitment to this case. Well, Your Honor, some immigration judges have recommended that because they said, well, you shouldn't get in if you're not prepared, but, you know, on the other hand, you want the client to have counsel, if at all possible, because I think, in my opinion, they're much better served if they have counsel. They can present their case much better if they have counsel. Let me ask you this question. I read his decision. It looks like even though he was very upset about the problems that he had in trying to get her to have her hearing, it seemed like you really, really did not show any prejudice against her that he has a full decision here. It looks like he thoroughly examined all of the underlying factual matters. If you were there, what would you have done different than what the— She did a pretty good job, actually. Well, right. She did, considering that she didn't have benefit counsel. What was missing from his analysis? Well, there's a lot of things. He would have brought to the table. There's a lot of things, Your Honor. One, there would have been an articulation of the particular social group. There would have been corroborating independent evidence. She did not submit any evidence. It was her testimony, and the judge found she wasn't credible. I thought he found she was credible. The board reversed the judge on that point. Oh, right. That's right. So that doesn't matter. The board specifically found her credible. So where's the prejudice? Well, Your Honor, I think it does matter in a way because it shows what way the judge is already leaning. He's saying, I don't believe this person. I don't believe what she says. Okay. But the board said they did believe her, so then what? Right. But that doesn't put us back. They didn't just say we're not going to— They didn't simply say we're not going to decide about her credibility, as they often do. They affirmatively said he was wrong about the credibility determination. Right. They said he was wrong on that. Very rare, actually. They said he was wrong on that, but they didn't give her the benefit because having counsel, one could obtain corroborating evidence, evidence, for example— What do you need corroborating evidence for if they believed everything she said? Well, they didn't. They didn't, Your Honor. They said they did. Well, they found that she said that if she stayed in Cameron or went back, she is likely to be circumcised, okay, what happens in her family and in her tribe and in her area. The board said, no, we don't believe you. They're lacking the substantial evidence because they said they believed her, so they were supposed to rule on that. But you haven't appealed that piece of it, have you? Yes, that's in the board's decision. I know it's in the board's decision, but it's not in your brief. Here. I thought we had mentioned that, Your Honor. Maybe I'm over time, but maybe I'll look for that. Thank you. Thank you. May it please the Court, Victoria Braga appearing on behalf of the Acting Attorney General. The Court should deny the petition for review because the agency's denial of relief and protection are supported by substantial evidence and because Ms. Arie's proceedings comported with due process. So I'm a little confused. Maybe you can straighten my confusion out. There's been no determination as to whether she was fully resettled in South Africa at all, I guess, right? I think that I.J. and the board considered her firmly resettled in South Africa based on her testimony that she But if she was firmly resettled in South Africa, how can they order her to be returned to Cameroon? She should go back to South Africa. Am I missing something here? Well, she remains a ñ she never testified that she had lost her citizenship in Cameroon, so she remains a native and citizen of Cameroon. The finding that she had been firmly resettled between ñ What finding that she was firmly resettled? Where? I guess the reference to the fact that she was firmly resettled was based on her testimony that she had received refugee status in South Africa. What is the relevance of ñ I have two questions. One, does the firm resettlement notion apply to withholding of removal? We have a case called Seong v. INS, which seems to say it doesn't. Yes, Your Honor, I'm aware of that case. This court has held that the firm resettlement bar does not apply to withholding of removal. In this case, I don't think firm resettlement should be seen as a bar. It's simply something that the I.J. and the board use in analyzing Ms. Arey's case. And what is the justification for that? Is there any ñ I mean, if they're going to send her back to Cameroon, then why isn't everything that happened to her in Cameroon relevant? How do you just cut off the fact of this long history of abuse by this man and act as if she's walking down the street and this guy happens upon her? And just shut your eyes to everything else that happened. What's the basis for that? Well, I think it's the principle's underlying firm resettlement. So when a person becomes firmly resettled, they're barred from obtaining asylum in our country based on the persecution that they had experienced that led to firm resettlement. Because you're going to send her back to this other country. But now you're not sending her back to this other country. You're sending her back to the first country where all this stuff happened. And to put complete blinkers on and make believe that the story is not what the story is, I don't ñ I've never seen a case justifying that. But I don't think that the board and the immigration judge are saying that the story is not what Ms. Arey ñ Well, they did. They said ñ they acted as if this guy just came upon her one day and decided to rape her. And they made no ñ and they said she's not in any domestic relationship with him. Even though he was ñ he ñ according to her, he believed that she was functionally his second wife even now. And they had children together and he was trying to kidnap the children as if this had nothing to do with her. So the agency's findings based on what you just mentioned are that there ñ between 2014 and when she left Cameroon in 2015, there was no past persecution. And that is based on the fact that there was only a singular encounter. It was an attempted attack. This court has held that threats and attempts fall short of ñ Well, even on that basis, what is the authority for the fact that if she was firmly resettled for some period of time but essentially isn't anymore, she's now back, that you ignore, for purposes of past persecution, the past in Cameroon? And where do we get that from? Well, the board is citing simply the firmer settlement regulations. As you said, firmer settlement does not apply to withholding. So we understand the board's analysis to be more factually based in this case. I think this is ñ But it's factually inaccurate. It's completely factually inaccurate. It says that she was not in a domestic relationship with this guy. And it says that there was only one thing that happened to her. So if we're going to put these seven years back in and go back to what happened before and put ñ and contextualize what actually occurred, obviously it didn't just happen once and there was a relationship between them and he wasn't just walking down the street and decided to rape her and so on. Right. Well, I was referring to the facts regarding when she lived in Cameroon and when she left. This isn't a typical firmer settlement case in that typically the move is from the country of persecution to the country of firmer settlement to the United States. Exactly. Here we have the person returning to the country where they had been persecuted. Well, because the government has ñ I mean, maybe the government could have set it up so that they were trying to send her back to South Africa, but they didn't. Right. So I'm not referring to where the government is trying to ñ Isn't that the key question? If they want to send her to Cameroon, then the question is, would she have passed persecution in Cameroon? And the answer seems to be clearly yes. That would be the question, although we do defend the board's decision that based on the facts of her move to South Africa and then her return to Cameroon, in firmer settlement cases, typically the person does not return to the country. It seems like you can't have it both ways. You can't go both ways at the same time. It's either one or the other. I'm sorry. Meaning if she's firmly resettled, in fact, then the notion should have been she should have gone back to South Africa. Or if you're going to send her back to Cameroon, then what's the relevance of whether she was firmly resettled in South Africa? It doesn't matter. Oh, I think it's relevant to a sort of well-founded fear analysis. I'm sorry, why? Isn't the question whether she has a well-founded fear in Cameroon, which involves everything that ever happened to her in Cameroon? Right. And this court has held that a willing return to a country where a person has been persecuted tends to mitigate against a well-founded fear. So I think here the board is using similar principles to find that she was firmly resettled and she doesn't deny that she received refugee status, which would qualify as firm resettlement under this court's case law. And then she chose to return to Cameroon, tending to undermine the fact that she had fear based on what the board said. Counsel, Judge Gould, if I could interject a question for you. Yes. I thought she went back to Cameroon because her brother passed away in South Africa and she was returning his body to his homeland to be buried. Yes. That was why she returned. It was a willing return. She wasn't forced to return to Cameroon. With regard to why the government— It may have been a willing return in some sense, but if culturally it's the norm in that area of West Africa that a person gets buried in their homeland, it's certainly understandable that she would take the body back. And if she does that, I don't see how that fact alone would support the inference that her fear is a bunch of made-up stuff. No, I agree with you on that point, but I do think that it certainly doesn't discount the fact that she— But it doesn't go to the past persecution at all. It may go to her fear of future persecution, but it doesn't go to her past persecution, does it? Well, what goes to her past persecution is the fact that she was firmly resettled from that persecution. Well, that's what you're saying. But this point you're making now, the fact that she went back to Cameroon, has nothing to do with whether you count for past persecution purposes everything else that happened to her in Cameroon. Well, the fact that the return is following a firm resettlement during which she was protected from past persecution, mitigating in the firm resettlement period against a well-founded fear, would serve to make sense of the Board's determination that in analyzing her claim, it was appropriate only to analyze the events of 2014. Do you have any case which has ever operated this way? We were unable to find any case which has ever followed this fact pattern, that is, firmer settlement, then a return to the country of past persecution, and then a move to the United States. And in which the past persecution—I mean, do you have any doubt, leaving aside the particular social group question, which I know is kind of in flux, but leaving that aside, that she had an incredibly strong past persecution claim with regard to what happened to her in Cameroon before she went to South Africa? Is there any doubt about that? I don't think it's analyzed by the agency. She did suffer—I mean, I think it was the theory of the agency that she had received refugee status in South Africa based on— I understand, but I'm asking you before that. If she hadn't gone to South Africa, if she'd come here at that point. Right, that's what I'm saying. I think the agency is understanding that she had received refugee status based on what had happened to her, so the agency is recognizing that she was harmed in such a way that she was eligible for refugee status in South Africa. So the question here is, what is the justification for ignoring all that and sending her back to Cameroon? Because that's what the proposal is. The proposal is not to send her to South Africa. It's to send her to Cameroon. Right, and again, we argue that it is a factual analysis in this case. If the court believes the board to be making some sort of statement about what the regulations require in this case, then I think a remand would be appropriate to allow the board to better explain that. Which regulations? The firm resettlement regulations, why— And besides which, on the withholding, you agree that the whole concept doesn't apply. I do, which is why we are unable to argue that this is a regulatory holding by the board. I think the board's analysis leaves open the possibility that this was a factual analysis, but based on the fact that the firm resettlement bar would not apply to withholding, I think the board would need to do more to explain the regulations and how they apply. So essentially you're conceding that the board was in error, at least with regard to the withholding, by applying the firm resettlement rule even as they understood it. Well, no. So I would be conceding that if the board was doing this as a regulatory analysis, then that would be an error. What do you mean as a—I don't know what that means. Well, so if the board is applying firm resettlement as a bar, then that would be incorrect, but— Well, here the board's just using the firm resettlement to analyze the totality of her claim, stating that the firm resettlement sort of mitigated against her fear. But you don't get to fear until you decide about whether there was in fact objectively past persecution. And they decided, in deciding that question, they completely took out everything that happened to her in Cameroon until she came back. So what you're saying is not how they proceeded. Right. So I think I am agreeing that if this Court believes that the board's analysis of firm resettlement in this regard was not complete enough, then the case should be remanded so that the board could explain more about why it conceptualized the regulations that way. Hopefully the court could note for the board in such a remand that under this court's case law, the firm resettlement bar would not apply to a withholding of removal claim. Is there anything you want to say about the counsel question? Our position is that Ms. Arie's proceedings comported with due process. She and her counsel, by what this court has considered in other cases gross inaction, implicitly waived the privilege of having counsel. And the immigration judge, we think, was correct to find that there was no good cause for— The immigration judge was certainly somewhat out of bounds route, at a minimum. I would agree with that. The immigration judge was clearly frustrated. I think that this probably happens in a lot of his cases. It seemed that this is not a script that he had used for the first time. And I think that the frustrations are warranted. Here, Ms. Arie, despite multiple warnings that her case would be continued, continued to ask for further continuances. She then produced an attorney just a week before a hearing, which the I.J. had asked her not to do. She then asked the I.J. to call the attorney, which the I.J. said he typically did not do. He then called the attorney, and the attorney was not, as you mentioned, in his office. It seems to me that he was able to set aside his frustrations, which in a way is understandable on that level, and nonetheless write a full and complete decision. Yes, following the immigration judge's decision to proceed at the April 6th hearing, he did elicit testimony, and he elicited testimony from Ms. Arie. He actually put country constitution articles into the record himself, and he issued a full decision on her case, construing it as a particular social group case, which her counsel has never objected to the I.J.'s classification of the group or classification of the claim. So the I.J. did ultimately afford Ms. Arie a full and fair hearing in accordance with the law. So she was not prejudiced by his decision not to further continue her case. I wanted to add one thing. In the case that this case is remanded based on the firm resettlement issue, if the agency then will be considering Ms. Arie's domestic violence-based claim again, I think that the remand should also include instruction that it should be analyzed under new precedent. No, we can't do that because we may not approve the new precedent. We can let the Board do whatever it's going to do, and then we can worry about it. I mean, we're not in any position to say that the new precedent is a valid precedent. We haven't decided that. Okay. That's okay. Thank you, Your Honor. So with that being said, we would urge the Court to accept the Board's factual analysis of firm resettlement in this case and to deny the petition for review based on the analysis by the IJ of the claim. However, if the Court does not accept the Board's firm resettlement analysis, then we would ask for a remand with instruction on how to proceed in that regard. Thank you very much. Your argument was quite helpful. I'll give you one minute, but I don't know if you want it. I'll try to keep it short. You are going to keep it short. One minute. Okay. I'll try to do less. I would disagree with counsel's statement that we did not disagree with the Board and the immigration judge's articulation of the particular social group. We did, throughout the brief, discuss that we believe that they mischaracterized what was appropriate particular social group. Your Honor, I'd like to bring to your attention just a Board decision that's in matter of YSLC. It's 26 INN Decision 688, page 690, where they discuss about the conduct of a judge can be perceived to be bullying or hostile, can have a chilling effect, thereby limit her ability to fully develop the facts of the claim. Well, we're sort of back to the prejudice question, though. She did a pretty good job. In any event, thank you. Thank you. Thank you very much. We'll take a short break. Thank you.
judges: Gould, Berzon, Block